IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| WYE OAK TECHNOLOGY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:09cv793 (AJT/JFA) |
| | ) | |
| REPUBLIC OF IRAQ | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

This matter is before the Court on Defendant's Motion to Dismiss (Doc. No. 19). The
Court held a hearing on the motion on June 22, 2010, after which the Court took the motion
under advisement. For the reasons below, the Court denies Defendant's motion to dismiss, but
grants Defendant's alternative request to transfer this action to the United States District Court
for the District of Columbia.

## I. BACKGROUND

On July 20, 2009, Plaintiff Wye Oak Technology, Inc. ("Wye Oak") filed this case
against Defendant Republic of Iraq ("Iraq") based on an alleged breach of a broker services
agreement entered into by Wye Oak and the Ministry of Defense of Iraq. On March 29, 2010,
Iraq filed a motion to dismiss for lack of personal or subject matter jurisdiction, improper service
of process, and improper venue.[1] On May 21, 2010, with leave of Court, Iraq filed a
supplemental brief in support of its motion to dismiss for lack of subject matter jurisdiction on

---

[1] Iraq also requests that if the Court denies its motion to dismiss, a separate briefing schedule be
set on the issue of *forum non conveniens*.

the grounds that only the Iraqi Ministry of Defense ("MOD"), and not the Republic of Iraq, is the proper defendant. Wye Oak opposes the motion.

## II. FACTS

The Verified Complaint (the "complaint"), along with a number of documents attached thereto, allege the following relevant facts.

Wye Oak is registered with the United States Department of State as an Exporter, Broker, and Importer of defense related articles and services. The Estate of Dale Stoffel ("Stoffel") is Wye Oak's sole shareholder. Wye Oak is a Delaware Corporation with its headquarters in Pennsylvania and conducts business in Alexandria and Arlington, Virginia.

In mid-2004, the MOD initiated the Iraqi Military Equipment Recovery Project ("IMERP") to provide the Iraqi military and security forces with working equipment. The objective of IMERP was to provide the equipment by early 2005 and also, in the longer term, to identify, collect, and sell irreparably damaged military equipment as scrap metal. The MOD requested Wye Oak's assistance in achieving both objectives.

Wye Oak and the MOD memorialized their agreement on August 16, 2004 in: (1) a Broker Services Agreement ("Broker Agreement"), which provides that Wye Oak will serve as the MOD's exclusive broker with respect to the sale of scrap metal and also the refurbishing and sale of military equipment; and (2) a letter (the "Letter") that "commissioned" Wye Oak with respect to the activities within the scope of the Broker Agreement. Under the Broker Agreement, Wye Oak was to receive ten percent of the contract value of any scrap metal sales contracts as well as ten percent of the cost of refurbishing military equipment. The Letter, sent on letterhead for "Republic of Iraq Iraqi Ministry of Defense," and signed by the Secretary General of the Iraqi Ministry of Defense, commissions Wye Oak as the "the sole and exclusive agent" with respect to

2

the recovery and sale of scrap metal. The Letter also states that, "[r]elated thereto, Wye Oak is also commissioned to inventory, assess and recover any such equipment it determines as recoverable for the use or sale on behalf of the [MOD]." On August 30, 2004, the parties executed a first amendment to the Broker Agreement, clarifying that Wye Oak was also charged with "construction of facilities, bases, billeting, service/repair depots, repair factories/facilities." The Broker Agreement defines the MOD as "The Ministry of Defense of the Republic of Iraq and shall be deemed to include all its affiliated instrumentalities, divisions and agencies of the Government of the Republic of Iraq." The Broker Agreement specifies that it is governed by Iraqi law.

Between August 16, 2004 and January 2005, Wye Oak performed under the Broker Agreement and Letter in connection with the repair and refurbishing of several armored battalions and by identifying and arranging for the sale of scrap metal from military equipment. Beginning in mid-August 2004, Wye Oak, through offices in the United States and employees and subcontractors in the field in Iraq, inventoried depots in Iraq for scrap, evaluated whether the equipment was worth refurbishing, estimated scrap tonnage, and identified potential foreign buyers. All potential buyer nations were approved by a United States military office.

Wye Oak performed multiple tasks in the United States related to its work in Iraq including accounting, running computer programs for tracking military equipment, meeting with Department of Defense officials regarding coordination of the refurbishment program in light of the reconstruction activities in Iraq, monitoring employees, contacting potential foreign buyers, ensuring that all necessary licenses were up to date, creating spreadsheet systems to ensure that pricing of scrap equipment and salvageable equipment could be compared, creating and making

3

maintenance preparations for an IMERP website, and maintaining and monitoring Wye Oak's United States-based bank accounts.

In October 2004, Wye Oak submitted three invoices to the MOD totaling $24,714,697.15 for work performed in connection with the military display related to the January 2005 elections as well as for funds necessary to undertake a few months of refurbishing work to be completed at approximately eighty military bases in Iraq. On December 5, 2004, a meeting in Baghdad was convened to discuss and resolve any payment issues. Stoffel attended, along with a number of United States government representatives. It was agreed at that meeting that a payment in the amount of $24,714,697.15 would be paid to Wye Oak immediately. On December 8, 2004, while traveling by car to Baghdad to collect the promised payment, Stoffel, along with another Wye Oak colleague, Joseph Wemple, were assassinated by unidentified gunmen.

After the assassination, Wye Oak continued working under the Broker Agreement, completed the refurbishing of certain equipment in time for the January 2005 Iraqi elections, and delivered more than 160 armored vehicles that it had repaired to the Iraqi army. Wye Oak never received any payment on its outstanding invoices or otherwise under the Broker Agreement.

### III. ANALYSIS

Iraq moves to dismiss the complaint on a number of grounds: (1) Wye Oak sued the wrong party; (2) lack of effective service under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 *et seq.* ("FSIA"), specifically 28 U.S.C. § 1608(a); (3) lack of subject matter jurisdiction and personal jurisdiction under the FSIA; and (4) improper venue under the FSIA. The Court addresses each argument in turn.

4

## A.    Whether Iraq is the Proper Defendant

In its supplemental filing, Iraq claims that this action must be brought only against the

MOD, not the Republic of Iraq, the named defendant.  The thrust of Iraq's contention is that the

MOD is a political subdivision of Iraq and a distinct juridical person under Iraqi law, solely

responsible under the applicable agreements that it alone entered into with Wye Oak.  In support

of this position, Iraq has filed a declaration from an Iraqi government representative who

purports to state authoritatively Iraqi law, as it pertains to the legal status of the MOD and the

Republic of Iraq and the lack of legal responsibility on the part of the Republic of Iraq for

contracts entered into by the MOD.

The Court understands Iraq's position to be, in substance, that because it is legally

distinct and separate from the MOD, it never engaged in any commercial activities relative to

Wye Oak and Wye Oak has therefore not pled an exception to Iraq's sovereign immunity under

the FSIA, which requires certain types of commercial activity on the part of a defendant in order

to confer subject matter jurisdiction on this Court.  Wye Oak responds that, under the FSIA,

there is no legal distinction between a political subdivision such as the MOD and the sovereign

state itself where, as here, the political subdivision shares "core functions" with the sovereign

state.[2]  Wye Oak further argues that Iraq's contention that Iraqi law insulates Iraq from liability

---

[2] The "core functions test" cited by Wye Oak is laid out in *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148 (D.C. Cir. 1994), in which the defendant, the Bolivian Air Force, appealed the ruling of a default judgment against it based on improper service.  The court explained that the Bolivian Air Force should be considered a "foreign state" under the FSIA, and that therefore Transaero must serve the Air Force under the service requirements pertaining to a sovereign state as opposed to those pertaining to an "agency or instrumentality." *Id.* at 153-154 (citing 28 U.S.C. § 1608(a), setting forth service requirements for a sovereign state or political subdivision, differentiating 28 U.S.C. § 1608(b) setting forth service requirements for an agency or instrumentality).  The U.S. Court of Appeals for the D.C. Circuit noted, "armed forces are as a rule so closely bound up with the structure of the state that they must in all cases be considered as the foreign state itself, rather than a separate agency or instrumentality of the state." *Id.* at

under a contract entered into by the MOD cannot be decided separate and apart from a final resolution on the merits of the case, and therefore cannot be resolved at this preliminary stage by way of a motion to dismiss. In this regard, Wye Oak contends that in all material respects the MOD was acting on behalf of Iraq and is indistinguishable from Iraq.

The Court views Iraq's claim that Wye Oak has sued the wrong party as part of its challenge to this Court's subject matter jurisdiction, which is properly considered at this stage. In that regard, and as discussed in more detail below, upon consideration of a motion to dismiss, and without an evidentiary hearing, the Court should take Wye Oak's factual allegations as true and consider all plausible inferences that may be drawn from those allegations in determining whether there is subject matter jurisdiction. *See Phoenix Consulting, Inc. v. Republic of Angola,* 216 F.3d 36, 39 (D.C. Cir. 2000). However, under the FSIA, there is no distinction between the sovereign state and its political subdivision for jurisdictional purposes. In fact, the definition of "foreign state" includes "a political subdivision of a foreign state or an agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a).[3] Further, the sovereign state and political subdivisions are treated as one and the same under the FSIA for purposes of service, venue, and certain exceptions to sovereign immunity. For the reasons discussed in Part III.C., *infra*, Wye Oak has

---

153. *Transaero* does not differentiate between the "sovereign state" and its "political subdivisions," however, and deals specifically with service. Similarly, the other cases Wye Oak cites for its "core functions" argument pertain to issues other than that presented here – namely, whether a sovereign state may not be sued, as a matter of law, in place of a political subdivision when the law of the sovereign state purportedly treats the political subdivision as a separate legal entity. *See, e.g., Garb et al. v. Republic of Poland,* 440 F.3d 579 (2d Cir. 2006) (distinguishing between "agency and instrumentality" and "sovereign state" for purposes of the "takings" exception to FSIA); *Compagnie Noga D'Importation, S.A. v. Russian Federation,* 361 F.3d 676 (2d Cir. 2004) (enforcing arbitration award against Russian government even though a political organ was named in the actual arbitration).

[3] While the FSIA defines "agency or instrumentality," it does not define "political subdivision." 28 U.S.C. § 1603(b).

6

made sufficient allegations to establish subject matter jurisdiction. Iraq's challenge to its being

named as the defendant based on its lack of responsibility for any contracts entered into by the

MOD is inextricably bound up with the ultimate merits of the case, as framed by the complaint,

and cannot be resolved within the present posture of the case. Accordingly, the motion to

dismiss based on Wye Oak's allegedly naming the wrong party as the defendant is denied.

**B.     Sufficiency of Service**

Iraq next contends that dismissal is proper because Wye Oak did not satisfy the

mandatory service requirements set forth in 28 U.S.C. § 1608(a). That statute states, in relevant

part:

> (a) Service in the courts of the United States and of the States shall
> be made upon a foreign state or political subdivision of a foreign
> state:
>
>         *      *      *
>
> (3) . . .by sending a copy of the summons and complaint and a
> notice of suit, together with a translation of each into the official
> language of the foreign state, by any form of mail requiring a
> signed receipt, to be addressed and dispatched by the clerk of the
> court to the head of the ministry of foreign affairs of the foreign
> state concerned, or
> (4) if service cannot be made within 30 days under paragraph (3),
> by sending two copies of the summons and complaint and a notice
> of suit, together with a translation of each into the official language
> of the foreign state, by any form of mail requiring a signed receipt,
> to be addressed and dispatched by the clerk of the court to the
> Secretary of State in Washington, District of Columbia, to the
> attention of the Director of Special Consular Services—and the
> Secretary shall transmit one copy of the papers through diplomatic
> channels to the foreign state and shall send to the clerk of the court
> a certified copy of the diplomatic note indicating when the papers
> were transmitted.

All parties agree that under 28 U.S.C. § 1608(a)(3) ("Section (a)(3)") Wye Oak was first required

to send a copy of a summons and other required documents, properly translated, in a package

addressed to the head of the Ministry of Foreign Affairs of Iraq and, if service could not be made

within thirty days through that mailing, Wye Oak could then effectuate service diplomatically, as set forth in 28 U.S.C. § 1608(a)(4) ("Section (a)(4)"). Wye Oak contends that it properly attempted service as required by Section (a)(3) and, after it could not successfully effectuate service after thirty days, it served Iraq through Section (a)(4).

The record shows that Wye Oak undertook a number of efforts to serve Iraq. Most relevant to this analysis are Wye Oak's efforts on October 8, 2009. On that date, a summons was issued by the clerk of the court to the "Head of the Ministry of Foreign Affairs" of Iraq, care of the Embassy of the Republic of Iraq in Washington, DC. A cover letter to the clerk attached to the summons notes that "[s]ince [Wye Oak has] been unable to determine the address of that ministry, we propose accomplishing that task [of service]" by addressing the summons package to the Embassy. The summons and complaint directed to the head of the Ministry of Foreign Affairs was in fact delivered to the Embassy through FedEx, with a request that it be forwarded through diplomatic pouch to the head of the Ministry of Foreign Affairs in Iraq and that the Ministry issue a signed receipt. However, no signed receipt was ever returned from the Ministry of Foreign Affairs; and, for that reason, on November 25, 2009, Wye Oak caused a summons to be issued by the clerk's office pursuant to Section (a)(4) to the "Republic of Iraq," care of the Director of Special Consular Services at the United States Department of State.

Iraq does not dispute that it was actually served under Section (a)(4), or that the service package it received met the service requirements of Section (a)(4). Rather, it argues that service under Section (a)(4) was premature, and therefore void, because Wye Oak had not first complied with the service requirements of Section (a)(3). Specifically, Iraq contends that because Wye Oak sent the October 8, 2009 summons to the Embassy of Iraq, Wye Oak never properly attempted service pursuant to Section (a)(3). In support of its argument, Iraq cites a number of

cases standing for the proposition that "strict compliance" with the service provisions of the FSIA is required. *See, e.g., Magness v. Russian Fed'n*, 247 F.3d 609 (5th Cir. 2001), *cert. denied*, 534 U.S. 892 (2001) (holding that strict compliance with 28 U.S.C. § 1608(a) is required). Iraq also cites legislative history and the Vienna Convention on Diplomatic Relations for the proposition that service of process may not be made on an Embassy and submits a declaration noting that FedEx and DHL had established delivery service to Iraq by April 2006 and that the clerk of the court could have utilized either carrier to dispatch the summons and complaint to the head of the Ministry of Foreign Affairs in Iraq in compliance with Section (a)(3).

Wye Oak argues that it satisfied the requirements of Section (a)(3) when it requested the clerk of the court to address the summons to the head of the Ministry of Foreign Affairs and that it properly served Iraq pursuant to Section (a)(4) when service under Section (a)(3) could not be effected for lack of a signed receipt from the head of the Ministry of Foreign Affairs. In this regard, Wye Oak asserts that it was not attempting to serve the Ministry of Foreign Affairs diplomatically under Section (a)(3). Rather, Wye Oak argues that it simply took the reasonable step of attempting delivery of a properly addressed summons and complaint to the required recipient through a recognized and reliable method during a time of war in Iraq, particularly since the FSIA imposes no specific mailing address requirement and Wye Oak had been unable to obtain an address for the Ministry of Foreign Affairs either from the Iraqi or the United States government.

The Court has found no case supporting Iraq's position based on facts similar to this case; and the cases relied on by Iraq are distinguishable from the facts of this case. In *Magness*, the plaintiff failed to comply with the requirements of Section (a)(3) because it mailed its complaint

directly to the Russian Deputy Ministry of Culture, instead of directing the clerk of the court to send the complaint to the head of the Russian Ministry of Foreign Affairs. The Fifth Circuit held that the plaintiff failed to strictly comply with the service requirements of the FSIA and that therefore service was ineffective. *Magness*, 247 F.3d at 613. Similarly, in *Hilaturas Miel, S.L. v. Republic of Iraq*, 573 F. Supp. 2d 781 (S.D.N.Y. 2008), service was found to be ineffective where the plaintiff did not send the exhibits or a translation as required under the statute.

Here, in contrast to those cases cited by Iraq, Wye Oak complied with the statute on its face, directing the clerk of the court to mail the summons to the head of the Ministry of Foreign Affairs of Iraq, with the proper documents, translations, and copies enclosed. The sole issue is, then, whether attempting to transmit the service package through the Iraqi Embassy rendered the service ineffective.

The Court concludes that the attempted service through the Embassy does not render service ineffective in this case. First, Wye Oak was not serving the Embassy itself or personnel within the Embassy, but rather attempting to use the Embassy as a conduit for service. Second, given the state of affairs in Iraq, Wye Oak could reasonably think that service directly to the head of the Ministry of Foreign Affairs in Iraq was impossible in this case due to unique, war-time security issues and the rebuilding and restructuring of the Iraqi government.[4] Third, Section (a)(3) does not impose a requirement that an otherwise proper service package must be delivered to a particular destination. No doubt, the address to which the service package is directed must bear some objectively reasonable relationship to the head of the Ministry of Foreign Affairs and

---

[4] In *Magness*, the Fifth Circuit recognized that under certain circumstances the service requirements of Section 1608(a) of the FSIA might be satisfied other than through strict compliance: "We leave open the possibility that, under extraordinary circumstances not present in this case, when service of process according to the express provisions of § 1608(a) is a manifest impossibility, other methods of service that fully satisfy the goals of section 1608(a) might be sufficient." *Id.* at 616 n.15.

the chosen method of delivery must have some reasonable expectation of success. However,

there is nothing on the face of Section (a)(3) that prohibits Wye Oak's chosen method of delivery

to the head of the Ministry of Foreign Affairs and, for that reason, there was no requirement in

Section (a)(3) with which Wye Oak failed to "strictly" comply.[5]

This Court has previously found effective service through an Embassy in similar

circumstances. *See Rux v. Republic of Sudan*, Case No. 2:04-cv-428, 2005 WL 2086202 (E.D.

Va. Aug. 26, 2005), *aff'd on other grounds*, 461 F.3d 461 (4th Cir. 2006), *cert. denied*, 249 U.S.

1208 (2007). In *Rux*, the plaintiff addressed the summons pursuant to Section (a)(3) to the

Ministry of Foreign Affairs in Sudan, but sent it to the country's embassy in the United States.

Sudan, like Iraq, argued that because the summons was not dispatched directly to the Ministry in

Sudan, service was improper. The Court disagreed, finding that service was sufficient. The

Court distinguished cases such as *Magness*, noting in that case the summons was addressed to

the wrong party in direct contravention of Section (a)(3). In *Rux*, however, as here, the summons

was addressed to the right party, but at a place other than the Ministry. The Court found this

distinction significant and concluded that service was proper. In so holding, the Court explained:

> Surely the legislature did not intend to designate the United States
> Postal Service or a commercial carrier as the preferred method of
> delivery to the Minister of Foreign Affairs. The text of §
> 1608(a)(3) does not prohibit service on the Minister of Foreign
> Affairs at an embassy address. Indeed, the statute does not
> prescribe the place of service, only the person to whom process

---

[5] Iraq took the position at oral argument on the motion to dismiss that Wye Oak would have
satisfied Section (a)(3) by having delivered to FedEx a service package addressed simply to
"Head of the Ministry of Foreign Affairs, Bagdad, Iraq," without any further directions as to
where to deliver it. It is debatable that such service is designed to be more likely successful than
Wye Oak's chosen method, which would appear to provide a more realistic chance of actually
achieving the desired objective, that is, ensuring the summons was delivered to the head of the
Ministry of Foreign Affairs. *See Magness*, 247 F.3d at 616 (citing "United States' interest in
ensuring that the proper officials of a foreign state are notified when a suit is instituted" as one
rationale for requiring strict compliance).

must be served. Sudan does not cite a single case in support of its position. To the contrary, the case law it cites involves instances where service was directed to a *person* other than the Minister of Foreign Affairs, not to a *place* other than the Ministry of Foreign Affairs. *See, e.g., Magness v. Russian Fed'n,* 227 F.3d 609, 613 (5th Cir.2001) (directing service to the president of the Russian Federation); *Transaero,* 30 F.3d at 153 (directing service to an ambassador).

*Id.* at *16 (emphasis in original).

For all of these reasons, the Court concludes that the attempted service under 28 U.S.C. § 1608(a)(3) was strictly compliant and that therefore the successful service under 28 U.S.C. § 1608(a)(4) was effective. Accordingly, Iraq's motion to dismiss based on improper service is denied.

## C.    Commercial Activity Exception to Sovereign Immunity

Iraq next contends that Wye Oak has failed to establish a recognized exception to its sovereign immunity, that it is therefore entitled to sovereign immunity, and that, as a result, this Court lacks subjection matter jurisdiction and personal jurisdiction pursuant to the FSIA.

The Court is "obliged to dismiss a case whenever it appears the court lacks subject matter jurisdiction." *Lovern v. Edwards,* 190 F.3d 648, 654 (4th Cir. 1999); *see also* Fed. R. Civ. P. 12(h)(3). "In order to preserve the full scope of that [sovereign] immunity, the district court must make the 'critical preliminary determination' of its own jurisdiction as early in the litigation as possible; to defer the question is to 'frustrate the significance and benefit to immunity from suit.'" *Rux,* 2005 WL 2086202, at *4 (quoting *Phoenix Consulting, Inc. v. Republic of Angola,* 216 F.3d 36, 39 (D.C. Cir. 2000)). In a defendant's challenge to the legal sufficiency of a complaint's jurisdictional allegations, "the district court should take the plaintiff's factual allegations as true and determine whether they bring the case within any of the exceptions to immunity invoked by the plaintiff." *Phoenix Consulting,* 216 F.3d at 40. "[D]ismissal is

warranted if no plausible inferences can be drawn from the facts alleged that, if proven, would provide grounds for relief." *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 93 (D.C. Cir. 2002).

The exceptions to sovereign immunity for a foreign state are set forth in 28 U.S.C. § 1605, which provides in pertinent part:

> (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—
>
>         \*        \*        \*
>
> (2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; *or* upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; *or* upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States;

(emphasis added). Iraq argues that the complaint does not set forth facts to show that the action is either: (1) based on a commercial activity carried out by Iraq in the United States; (2) based on an act performed in the United States in connection with a commercial activity of Iraq elsewhere; or (3) based on an act outside the United States in connection with a commercial activity of Iraq elsewhere and that act caused a direct effect in the United States. Wye Oak argues that jurisdiction is appropriate based on any of the three provisions.[6] As discussed below, the Court concludes that Wye Oak has sufficiently alleged facts to establish that all three exceptions to sovereign immunity apply.

---

[6] As explained above, the Court has found that Wye Oak may bring this suit against Iraq, although the Broker Agreement was entered into by the MOD of Iraq. Based on the Court's conclusion that Iraq may be liable for the MOD's contract, the conduct of the MOD is relevant to the determination of whether or not an exception to sovereign immunity applies to Iraq.

### a. Commercial Activity Carried out in the United States by Iraq

Iraq argues that all actions taken by Wye Oak in the United States were as a broker and not as Iraq's agent and that therefore any "commercial activity" in the United States was not by Iraq. Wye Oak, on the other hand, argues that the complaint sets forth a factual basis for a finding that it was acting as Iraq's agent in carrying out its activities in the United States (which included, as set forth in paragraph 22 of the complaint, monitoring activities of employees, contacting foreign governments, issuing employment contracts, and ensuring licenses were current, among other tasks). In support of this argument, Wye Oak cites the Broker Agreement and the Letter. In particular, the Letter names Wye Oak as Iraq's "agent," though Iraq argues that the Letter limits Wye Oak's duties as Iraq's agent to scrap metal sales and that scrap metal sales are not the basis for the lawsuit.

The capacity in which Wye Oak acted in the United States, relative to Iraq, is in dispute. On the one hand, the complaint alleges that "Wye Oak was commissioned as agent for Iraq for selling and refurbishing military equipment," that the Broker Agreement commissioned Wye Oak as an agent to carry out at least some tasks relating to refurbishment, and that Wye Oak carried out some of those tasks or related tasks in the United States. The Letter confirms that Wye Oak was commissioned to act to a certain extent as an agent. On the other hand, the Broker Agreement specifically states that the relationship between Wye Oak and the MOD is that of independent contractor. At oral argument, the parties had different views concerning how to reconcile the differing characterizations of Wye Oak and in what capacity Wye Oak acted as to which activities. Nevertheless, it appears plausible, based on the factual allegations of the complaint and referenced writings, that Wye Oak carried out commercial activities in the United States as an agent of Iraq. Accordingly, Wye Oak has made a sufficient showing at this stage of

these proceedings that the first exception to the FSIA's grant of sovereign immunity applies to Iraq in this case.

### b. Act Performed in the United States in Connection with Commercial Activity of Iraq Elsewhere

The FSIA also confers subject matter jurisdiction when there is "an act performed in the United States in connection with a commercial activity of the foreign state elsewhere." For this exception to sovereign immunity to apply, courts have required that jurisdiction-conferring "acts" in the United States "are limited to those which *in and of themselves* are sufficient to form the basis of a cause of action." *Heroth v. Kingdom of Saudi Arabia*, 565 F. Supp. 2d 59, 67 (D.D.C. 2008), *aff'd* 331 Fed. Appx. 1 (D.C. Cir. 2009) (quoting *Zedan v. Kingdom of Saudi Arabia*, 849 F.2d 1511, 1514 (D.C. Cir. 1988)) (emphasis added).

The complaint alleges that Wye Oak performed a variety of acts in the United States in connection with Iraq's commercial activities in Iraq relating to and under the contract at issue. Specifically, Wye Oak alleges its tasks in the United States included accounting, tracking military equipment, monitoring employees, coordinating sales, and monitoring bank accounts all in connection with the execution of the Broker Agreement. In fact, the Broker Agreement requires Wye Oak to undertake responsibility for "the accounting, inventory and assessment" of the military equipment, tasks which the complaint asserts Wye Oak performed in the United States.

Wye Oak further alleges that Iraq engaged in commercial activities in Iraq under the Broker Agreement. For example, under the Broker Agreement, the MOD agreed to "[w]ork exclusively with the Broker [Wye Oak] regarding furnishing of Military Refurbishment Services, Scrap Sales and the sale of Refurbished Military Equipment with respect to all Military Equipment." The MOD also agreed to function as a contractor or a subcontractor for sales

contracts procured pursuant to the Broker Agreement. *See* Complaint Exh. 2 (Broker Agreement) at ¶ 4.

The Court finds and concludes that Wye Oak has plausibly alleged acts in the United States related to Iraq's commercial activities in Iraq, and that these acts form the basis of this lawsuit. Accordingly, Wye Oak has sufficiently established at this stage that this exception to the FSIA's sovereign immunity applies and the Court may exercise subject matter jurisdiction over Iraq in this case.

### c. Act Outside the United States in Connection with Commercial Activity of Iraq Elsewhere and that Act Causes a "Direct Effect" in the United States

Finally, Iraq argues that there was no act outside of the United States that occurred in connection with Iraq's commercial activity that had a direct effect in the United States. In support of its argument, Iraq cites *United World Trade, Inc. v. Mangyshlakneft Oil Production Ass'n*, 33 F.3d 1232 (10th Cir. 1994), *cert. denied*, 513 U.S. 1112 (1995). Wye Oak, on the other hand, argues that the financial effect in the United States – especially the loss of funds caused by Iraq's breach – constitutes a direct effect, citing *Texas Trading & Mill Corp. v. Federal Republic of Nigeria*, 647 F.2d 300 (2d Cir. 1981). Wye Oak also points to the impact in the United States on military policy and the IMERP as a result of activities in Iraq related to the performance of the contract.

In *United World Trade*, the Tenth Circuit found the financial effect on the plaintiff from defendant's conduct was not a "direct effect" because the contract stated that the defendant's payment obligation was to Paris, not the United States. The court explained:

> Nor is the fact that [plaintiff] is an American corporation that suffered a financial loss sufficient to place the direct effect of the defendants' actions "in the United States." Appellant would have us interpret § 1605(a)(2) in a manner that would give the district courts jurisdiction over virtually any suit arising out of an overseas

> transaction in which an American citizen claims to have suffered a
> loss from the acts of a foreign state. We think that the language of
> § 1605(a)(2) limiting jurisdiction to cases where there is a "*direct*
> effect" in the United States makes it unlikely that this was
> Congress' intent."

*Id.* at 1239 (emphasis in original). Accordingly, the court found that the allegations did not demonstrate that the defendant's actions had a "direct effect" in the United States.

In contrast, in *Texas Trading*, cited by Wye Oak, the Second Circuit found the plaintiff's financial loss in the United States constituted a "direct effect" under the statute. The court found that the financial loss caused by cancellation of a contract was "direct" and that the loss occurred in the United States for two main reasons: "First, the cement suppliers were to present documents and collect money in the United States, and the breaches precluded their doing so. Second, each of the plaintiffs is an American corporation." *Id.* at 312. Similarly, in *Cruise Connections Charter Mgmt 1, LP v. Attorney General of Canada*, 600 F.3d 661, 665 (D.C. Cir. 2010), the court held that the alleged breach of a contract to provide cruise ship services in Canada had a direct effect in the United States where the plaintiff experienced financial losses caused by the termination of the contract, the contract was negotiated in the United States, one of the cruise ships under the contract would have traveled through United States waters, the contract's termination resulted in up to $40 million of lost cruise-related business in the United States, and contracts related to the terminated contract called for performance in the United States.

The Court need not decide whether the financial loss Wye Oak alleges is alone sufficient to establish a "direct effect" as there exists in this case allegations of more than financial loss in the United States, including the effects arising from the murder of Stoffel and Wemple, and the impact of Iraq's alleged breach of contract on United States' military policy and the IMERP that was formulated and to a certain extent monitored and evaluated in the United States.

Accordingly, the Court finds and concludes at this preliminary stage that acts in Iraq pertaining to Iraq's commercial activities had direct effects in the United States and that Wye Oak has alleged facts establishing subject matter jurisdiction under this "direct effect" exception to sovereign immunity.

**D.      Fed. R. Civ. P. 12(b)(3) – Improper Venue**

Finally, Iraq argues that the case should be dismissed for improper venue or, in the alternative, transferred to the District of Columbia.  Under the FSIA, venue is established in one of four ways, as set forth in 28 U.S.C. § 1391(f).  The two relevant provisions are:

> (f) A civil action against a foreign state as defined in section 1603(a) of this title may be brought—
>
> > (1) in any judicial district in which a substantial part of the events or omissions giving rise to the claim occurred
> >
> > *      *      *
> >
> > (4) in the United States District Court for the District of Columbia if the action is brought against a foreign state or political subdivision thereof.

While conceding that Wye Oak need not establish that the *most* substantial acts occurred in the Eastern District of Virginia for venue to lie here, Iraq asserts that the factual allegations in the complaint make clear that virtually all of the acts and omissions occurred in Iraq. Specifically, Iraq cites the facts that the Broker Agreement was executed in Iraq; the refurbishment and rehabilitation of equipment and construction of facilities occurred in Iraq; delivery of facilities and military vehicles occurred in Iraq; invoices were presented in Iraq; and field service work occurred in Iraq.

In response, Wye Oak relies on (1) Wye Oak's contacts with the Pentagon, which is located in this District, including at least two meetings that took place on November 30, 2004

and December 3, 2004;[7] (2) Stoffel's planned meeting in late 2004 with Pentagon officials at the Pentagon to discuss Wye Oak's project with the Special Inspector General for Iraq Reconstruction;[8] (3) the presence of bank accounts in the Eastern District; and (4) the presence of a part-time general counsel in the Eastern District. In the hearing on the motion, Wye Oak's counsel also pointed to the supervisory role of Pentagon officials over the Broker Agreement generally, but the parties dispute how much supervision took place in the Eastern District and how much supervision took place in Pentagon offices overseas.

In evaluating whether a "substantial part of the events or omissions giving rise to the claim" occurred in this District, the Court must consider the entire circumstances and events pertaining the alleged contract and its breach. *See Power Paragon, Inc. v. Precision Technology USA, Inc.*, 605 F. Supp. 2d 722, 726 (E.D. Va. 2008). Nevertheless, courts have recognized that particular attention should be paid to those core aspects of any contract dispute, including where the contract was negotiated or executed, where it was to be performed, and where the alleged breach occurred. *See Tonoga, Ltd. v. Ministry of Public Works and Housing of the Kingdom of Saudi Arabia*, 135 F. Supp. 2d 350, 359 (N.D.N.Y. 2001) (internal quotations omitted). For example, in *Translinear, Inc. v. The Republic of Haiti*, 538 F. Supp. 141, 144-145 (D.D.C. 1982), the court held that "substantial events" had occurred in the Northern District of Texas when certain services covered under the contract were performed there, the plaintiff's subcontractor was located there, and Haiti officials met with the plaintiff there. Similarly, in *Tonoga*, in finding venue proper, the court relied on the facts that Saudi Arabia negotiated and formed a

---

[7] Following oral argument on the motion to dismiss, Wye Oak filed Plaintiff's Motion for Leave to File Post-Hearing Memorandum (Doc. No. 38). A declaration attached to its proposed memorandum references meetings that took place with the Pentagon on November 30, 2004 and December 3, 2004. By Order dated June 28, 2010, the Court granted Wye Oak's motion and has considered the facts submitted in that declaration.

[8] The meeting never took place because of the assassination of Stoffel.

contract with the plaintiff whose principal place of business was in New York and that Saudi Arabia sent an agent to the New York forum to inspect the materials that were the subject of the contract. *Tonoga, Ltd.*, 135 F. Supp. 2d at 358. In contrast, in *Tifa Ltd. v. Republic of Ghana*, 692 F. Supp. 393 (D.N.J. 1988), the court found venue inappropriate in New Jersey. In explaining its conclusion, the Court noted "[t]he presence of Tifa's headquarters in New Jersey did not give rise to this claim. . . . The mailing of the original proposal was merely a preliminary negotiation. The single meeting in New Jersey also appears to be a preliminary discussion and Tifa does not allege reliance on the meeting. . . . [M]ore extensive events giving rise to the claim would be required in New Jersey in order for New Jersey to be the proper venue." *Id.* at 406.

Here, it is unclear, at best, what Wye Oak contends took place in this District that "gives rise to the claim." There is no contention that the Broker Agreement or the Letter was negotiated or signed in this District. Significant is that the complaint does not allege that any of Wye Oak's specific activities in the United States pertaining to the Broker Agreement occurred in this District. *See* Complaint at ¶ 22. Nor has Wye Oak alleged in any detail or substance what occurred at the Pentagon, as opposed to in Iraq or elsewhere in the United States, such that venue is appropriate in this District. In fact, the complaint makes only the conclusory allegation that Wye Oak performed "a substantial part of [the Broker Agreement]" in this District. Complaint at ¶ 6. Against this absence of facts, Wye Oak's bare allegations concerning the fact of two meetings that occurred at the Pentagon in 2004 and one scheduled meeting at the Pentagon that never occurred, the presence of a part-time legal officer at his home in this District,[9] the existence of a company bank account, and some generally described and unquantifiable amount of Pentagon supervision over the Broker Agreement do not cure the complaint's failure to

---

[9] During oral argument, Wye Oak stated that its business presence in this District was the home of its legal counsel, who was not an employee of the company.

identify in this District a "substantial part of events or omissions" giving rise to Wye Oak's claim. Accordingly, Wye Oak has failed to establish venue in this District under 28 U.S.C. § 1391(f)(1); and pursuant to 28 U.S.C. § 1391(f)(4), the case will be transferred to the District Court for the District of Columbia.

## IV. CONCLUSION

For the above reasons, Defendant's motion to dismiss is denied and Defendant's request to transfer the case to the United States District Court for the District of Columbia is granted.

An appropriate Order will issue.

_____
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
June 29, 2010